Banknorth v. Zeeman, No. 173-3-04 Wncv  (Katz, J., Dec. 20, 2004)

[The text of this Vermont trial court opinion is unofficial.  It has been reformatted from the original.  The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

STATE OF VERMONT                                        SUPERIOR COURT
Washington County, ss.:                              Docket No. 173-3-04 Wncv


BANKNORTH N.A.

v.

JOHN H. ZEEMAN


FINDINGS OF FACT
CONCLUSIONS OF LAW
AND NOTICE OF DECISION


        This matter came on for trial on October 19, 2004.  Based on the evidence presented, the following decision is announced.

FINDINGS OF FACT

        1.  Defendant John Zeeman endorsed and deposited at Banknorth's Waitsfield branch an apparent certified check, issued by J. P. Morgan/Chase for $400,000.

        2.  The check proved a forgery.

        3.  Defendant acquired the check from some unknown person who had previously contacted him by telephone.  Defendant's deal with the source was that he would receive this "bank" check, deposit it, and then obtain a wire transfer for $345,000 to some bank in Austria.

4.  Defendant carried out his instructions and directed Plaintiff Banknorth to issue the wire transfer on the strength of the endorsed instrument.

5.  When Defendant inquired as to when he would be able to draw on the funds represented by the check, he was given an answer.  It was based upon the bank's "funds availability" policy, which provided, generally, that "[f]unds from the following deposits are available on the first (1st) Business Day after the day of your deposit: . . . Cashier's, certified, treasurer's and teller's checks, including out-of-state checks that are payable to you if you use a special deposit slip . . . ."  Additional language stated "In some cases, we will not make all the funds you deposit by check available at the times shown in this Policy.  Depending on the type of check that you deposit, funds may not be available until the fifth (5th) Business Day after the day of your deposit. . . . We will also tell you when the funds will be available."

6.  Defendant deposited the check on October 8, 2003, informing bank employee O'Grady that he wished to have a wire transfer issued out of the funds it represented.  She advised that he would have to wait at least two business days.  On October 10, O'Grady told Defendant he could have the wire transfer accomplished.  So, Defendant gave his instructions to O'Grady to issue the $345,000 wire transfer to Austria.

7.  The transfer was made.  Banking laws in Austria turn out to afford the recipient a high degree of confidentiality, such that the money is quite lost to both Banknorth and Defendant Zeeman.

8.  A few days later, the bank learned that the check was a forgery, and so informed defendant customer.  It attempted to recall the transfer through its intermediary bank, American Express, but was unable to do so.  It then charged back against his account the sum of $18,874, which was all it had in it.  Banknorth brings this lawsuit to recover the balance of the wire transfer, which it made to the Austrian bank, as instructed.

CONCLUSIONS OF LAW

A.     At the conclusion of the evidence, the court inquired of counsel whether Defendant Zeeman's endorsement of the check should have any significance.  That was the first mention of endorsement.  Not surprisingly, Banknorth immediately seized on the issue.  Defendant Zeeman now argues that he is confronted with an unfair alteration of theories of recovery, the original complaint "having been pled in contract."  Defendant argues that, in effect, the switch would require an amendment of the complaint, which itself would be unfair now that the evidence is closed.

We disagree.  The adoption of the Federal Rules of Civil Procedure, particularly Rule 8, which is identical to Vermont's later adoption of the rule, effectively abolished the restrictive theory of the pleadings doctrine.  See 5 C. Wright & A. Miller, Federal Practice and Procedure (2d ed. 1990) § 1219, at 189-90.  "[T]he theory of the pleadings mentality has no place under [modern] practice.  Rule 8(a) eliminates the concept of 'cause of action.'"  Id. at 190.  As a heading in a footnote aptly suggests, "Pleading legal theory unnecessary."  Id. at 190 n.7.

B.     Moreover, "[p]articular theories of counsel yield to the court's duty to grant the relief to which the prevailing party is entitled, whether demanded or not."  Gins v. Mauser Plumbing Supply Co., 148 F.2d 974, 976 (2d Cir. 1945) (Clark, J.), quoted in Wright & Miller, supra, at 191-92.

> The real issue, of course, is not whether legal theories may be pleaded but whether the original theory may be discarded and recovery had on some other theory.  The federal rules, and the decisions construing them, evince a belief that when a party has a valid claim, he should recover on it regardless of his counsel's failure to perceive the true basis of the claim at the pleading stage, provided always that a late shift in the thrust of the case will not prejudice the other party in maintaining his defense upon the merits.

Wright & Miller, supra, at 192-94.

3

Here, the court inquired of counsel regarding the legal effect of an endorsement and invited response in post-trial memos. The evidence had been completed. No one now seriously suggests that some additional evidence would have been relevant. There has been ample time to respond on the law. There is no need for any amendment of pleadings.

C.      Provisions of Article 3 of the Uniform Commercial Code (UCC), Negotiable Instruments, apply to the check at issue in this case to the extent those provisions do not conflict with Article 4, Bank Deposits and Collections. See 9A V.S.A. § 4–102(a). Under Article 3, the paper Defendant deposited into his account at Banknorth, Def. Ex. B, was a negotiable instrument – it meets all the requirements of 9A V.S.A. § 3-104. The fact that it was a forgery does not detract from the conclusion that it was a negotiable instrument. See, e.g., Official Comment, 9A V.S.A. § 3–302 (holder in due course doctrine extends so long as instrument is not so irregular as to reflect negatively on its authenticity). Defendant signed the instrument on its rear, at the usual place, marked as well for "endorsement," indicating "For Deposit Only."

D.      A person such as Defendant who endorses an instrument "is obliged to pay the amount due on the instrument [] according to the terms of the instrument at the time it was [e]ndorsed." 9A V.S.A. § 3–415(a). "The obligation of the [e]ndorser is owed to a person entitled to enforce the instrument." Id. Endorsement guarantees that the endorser will pay the instrument should it be dishonored. Brown v. Pilini, 128 Vt. 324, 330 (1970). Thus, under Article 3, by endorsing the check and depositing it, Mr. Zeeman acquired liability for any losses arising when it was dishonored.

E.      This result is consistent with the more specific provisions of Article 4 of the UCC, Bank Deposits and Collections. When Defendant Zeeman deposited the check into his Banknorth account, Banknorth began acting as a collecting bank, meaning that it would handle the check for the purpose of collection. See 9A V.S.A. § 4–105(5); see also id. § 4–205(1) (Banknorth also became an Article 3 holder in due course). With respect to that check, until final settlement, Banknorth was no more than Defendant Zeeman's agent for collection and any settlement was provisional only. See id. § 4–201(a). By "transferring" the check to Banknorth for

4

collection, Mr. Zeeman made § 4–207(a) transfer warranties and agreed, in parallel with his obligations under § 3–415, to pay the amount due on the check if it eventually was dishonored.  See 9A V.S.A. § 4–207(b).

F.    Awaiting final settlement, Banknorth provisionally settled the collection by crediting Mr. Zeeman's account and making those funds available to him.  During this time, the "risk of non-collection" of the deposited check, generally, was with Mr. Zeeman.  <u>Call v. Ellenville Nat. Bank</u>, 774 N.Y.S.2d 76, 78 (N.Y. App. Div. 2004).  The payor bank, J.P. Morgan/Chase, see 9A V.S.A. § 4–105(3), of course, never paid because the check was dishonored as counterfeit.  With no final payment, there was no final settlement.

G.    The final settlement never occurring, Banknorth retained the right to revoke the provisional settlement, charge back the related credit to Mr. Zeeman, and seek a refund.  Those rights are plainly stated at § 4–214(a):

> If a collecting bank has made provisional settlement with its customer for an item and fails by reason of dishonor, suspension of payments by a bank, or otherwise to receive settlement for the item which is or becomes final, the bank may revoke the settlement given by it, charge back the amount of any credit given for the item to its customer's account, or obtain refund from its customer, whether or not it is able to return the item, if by its midnight deadline or within a longer reasonable time after it learns the facts it returns the item or sends notification of the facts.  If the return or notice is delayed beyond the bank's midnight deadline or a longer reasonable time after it learns the facts, the bank may revoke the settlement, charge back the credit, or obtain refund from its customer, but it is liable for any loss resulting from the delay.  These rights to revoke, charge back, and obtain refund terminate if and when a settlement for the item received by the bank is or becomes final.

This, of course, is exactly what happened in this case; when the payor bank declined to honor the check, Banknorth properly went looking for the return

5

of its provisional credit. Mr. Zeeman, unfortunately, had already transferred the bulk of it away irretrievably. Although Banknorth may be unlikely, ultimately, to recover all of its loss, it is secure in its ability to establish Mr. Zeeman's liability for it, which it has done here.

H. Mr. Zeeman poses, substantially, three arguments in opposition to this result. First, he argues that Banknorth failed to provide timely notice that the check was dishonored. The facts, however, do not support that claim. After it first received notice that the check would not be honored, Banknorth promptly notified Mr. Zeeman. Moreover, the full extent of the loss was complete at the moment of the wire transfer. Banknorth first learned that the check was dishonored several days later. At most, untimely notice can support the bank's liability only to the extent that the loss was caused by the delay. See 9A V.S.A. § 4–214(a). Here, delay had nothing to do with the loss.

I. Mr. Zeeman also argues that, in fact, the wire transfer itself means that there was a final settlement. As § 4–214(a) provides, final settlement would extinguish Banknorth's ability to charge back the provisional credit and seek a refund. Of course, the wire transfer to which Mr. Zeeman refers is the one he executed out of his account, not one that put funds into his account as a result of the collection of the check. The wire transfer has nothing to do with whether final settlement of the collection of the deposited check ever occurred. The provisional settlement simply never became final.

J. Third, Mr. Zeeman argues that as a matter of contract or tort, the "availability" of funds in his account, or representations related to the availability of funds in his account, support Banknorth's liability. At the outset, we note that the "availability" of funds under Article 4 of the UCC has nothing to do with final settlement. Final settlement is what fixes the depositor's right to the funds, not availability. Id. § 4–215(e). Mr. Zeeman expounds on his misunderstanding about "availability" by requesting a finding to the effect that a statement about availability was reasonably understood by him to mean that the check had "cleared," implying that he had a final right to the funds. (Defendant's Proposed Findings of Fact and Law at 4, ¶ 19.) The term "cleared," however, is not used in the UCC at all

and no evidence suggests that it should mean (or that bank staff used it to mean) "final settlement," which, again, is what mattered.

K.      Nevertheless, Mr. Zeeman claims that "funds availability" provisions of the Personal Deposit Account Agreement (PDAA), the account agreement between Banknorth and Mr. Zeeman, are ambiguous as to the meaning of "availability" and support his final right to the provisionally credited funds.  Though banks must comply with federal rules about, among other things, funds availability, generally speaking, relevant provisions of the Article 4 may be varied by agreement.  9A V.S.A. § 4–103(a).  The "funds availability" provisions of the PDAA, however, do not meaningfully blur the distinction between a provisional and a final settlement.  Quite to the contrary.  For example, one such provision states:

> **Checks Returned Subsequent to Funds Being Made Available**: If a check you deposited to your Account is returned to us unpaid after the funds have been made available to you, the amount of the check will be charged to your Account.  If there are insufficient funds in your Account, we reserve the right to demand payment directly from you and may charge you for insufficient funds as posted in our most recent Fee Schedule.

PDAA at 33.  This language has no ring of ambiguity: availability does not mean final settlement.

L.      Lastly, Mr. Zeeman claims that his misunderstanding, or lack of awareness, of the importance of final settlement was caused by misrepresentations by bank staff.  The only "misrepresentations" he cites, however, are accurate representations about funds availability.  Objectively speaking, no facts suggest that any bank staff improperly led Mr. Zeeman to think that final settlement had occurred, and Banknorth did not have an affirmative duty to ensure that Mr. Zeeman grasped the significance of "final settlement" prior to permitting him to execute the wire transfer.

M.      Given Defendant Zeeman's responsibility for the loss, Banknorth had the right to seize deposited funds to reduce or eliminate debts owed to it by its depositor.  See O'Donnell v. Bank of Vermont, 166

Vt. 221, 225 (1997).  In Vermont, the right to setoff derives from the contractual relationship between the depositor and the bank.  See <u>Hale v. Windsor Sav. Bank</u>, 90 Vt. 487, 494 (1916) (bank account is basis for contractual relationship between depositor and bank).  By placing funds in an ordinary account, a depositor gives the bank legal title to them, and, absent a specific agreement to the contrary, becomes the bank's creditor up to the amount of the deposit.  <u>Caledonia Nat'l Bank v. McPherson</u>, 116 Vt. 328, 330 (1950).  As titleholder, the bank has the right to apply the depositor's money to extinguish a matured preexisting debt.  <u>Goodwin v. Barre Sav. Bank & Trust Co.</u>, 91 Vt. 228, 235 (1917).  In <u>Goodwin</u>, the Vermont Supreme Court described the bank's position as that of a lienholder on the customer's deposit.  By virtue of this lien, the banker "has the right to set off any matured debt against such funds without direction or authority from such customer."  <u>Id</u>. at 235.


## NOTICE OF DECISION


For the foregoing reasons, Plaintiff BankNorth is entitled to have judgment entered against Defendant for the principal amount it is due on the endorsed instrument, and to have the counterclaim dismissed.  Counsel for Plaintiff to submit proposed form of judgment.


Dated at Montpelier, Vermont, _____, 20____.


_____
Judge

8